THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| WILLIAM M. LEBLANC, THOMAS A. BOHANNON, JAMES A. JORDAN, and PETER TENEREILLO, | : : : : |
| Plaintiffs, | : Civil Action |
| | : No. 3:03-cv-65 |
| v. | : : |
| NORTEL NETWORKS CORPORATION, | : : |
| Defendant. | : : |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case transports the imagination to what seems like the distant past, the first year of the twentieth-first century, the climax of an era of good feeling. Economists speculated about the end of the business cycle, politicians worried over how to deal with trillions of dollars in surplus revenues, and many Americans contemplated early retirement funded by a vigorous stock market. Booming technology companies led the markets, and young high-tech entrepreneurs were the heroes of the day.

Plaintiffs in this case were such entrepreneurs. In January of 2000, Plaintiffs William LeBlanc, Thomas Bohannon, and James Jordan, along with other colleagues from previous employment with Cisco Systems, formed Pharsalia Technologies, Inc. Their goal was to develop a product known as a "global server load balancer," for use in computer networking. A larger corporation, Alteon WebSystems, Inc., provided financing for Pharsalia, with the intent that it would acquire Pharsalia in the event that its efforts showed promise. In January and March of 2000, LeBlanc, Bohannon, and Jordan each purchased a total of 80,000 shares of Pharsalia for a total price

of $8.00. In April, Plaintiff Tenereillo, a consultant for Pharsalia, was permitted to purchase 40,000 shares of the company for a total price of $4.00. These shares were subject to a right of repurchase which was scheduled to lapse in monthly installments beginning six months after the purchase.

On July 17, 2000, Alteon acquired Pharsalia, and Plaintiffs' Pharsalia stock became Alteon stock, subject to the same right of repurchase. At the same time, unknown to Plaintiffs and other Pharsalia personnel, Alteon was in negotiations with an even larger company, Nortel Networks Corporation, to enter into a merger agreement. At the time of the talks, Nortel's stock was trading at around $80 per share. Alteon's stock was not publicly traded. The negotiations were successful, and Alteon and Nortel entered into an agreement and plan of merger on July 28, 2000, less than two weeks after the merger between Alteon and Pharsalia. The merger agreement was to close and become effective on October 5, 2000.

At the time the Nortel merger was announced, LeBlanc, Bohannon, and Jordan each owned outright approximately 41,000 shares of Alteon, which they possessed in the form of stock certificates held by themselves or their personal brokers. They also owned a larger number of shares that remained subject to the right of repurchase. For many of these shares, that restriction was scheduled to expire between July and November of 2000. Tenereillo did not own any shares outright, but owned a number of the restricted shares. The certificates for the restricted shares were held by Alteon prior to their "vesting."

The terms of the merger agreement with Nortel provided that after the close of the merger on October 5, 2000, each Alteon share would convert to 1.83148 shares of Nortel. The restricted shares would convert at the same ratio, subject to vesting at the schedule previously defined by Alteon. For twenty-five percent of the restricted shares, the expiration of the right of repurchase was

accelerated. At the time of the merger, according to these provisions, LeBlanc, Bohannon, and Jordan each owned 76,059 shares of Nortel outright, and 152,120 "vested" shares. Tenereillo owned 114,090 "vested" shares.[1]

Although the merger agreement provided that the Alteon stock would "become and be converted" into shares of Nortel on the effective date of the merger, the agreement provided a procedure for exchanging Alteon certificates for Nortel certificates. This procedure required Nortel or its exchange agent (Montreal Trust Company) to send to each Alteon shareholder – "as promptly as practicable" after the effective date of the merger – "transmittal materials for use in exchanging" old Alteon share certificates for new Nortel share certificates. The new certificates were to be delivered to the shareholder upon delivery to the exchange agent of the old certificates.

Plaintiffs contend in this lawsuit that the exchange of certificates took place too slowly, and that as a result they were unable to sell their shares for several weeks after the close of the merger, during which the share price of Nortel dropped considerably. Nortel's share price had already begun to fall several weeks before the October 5 close. On September 1, 2000, Nortel closed at $82.88. By October 5, it was trading at $66.75. On October 25, the share price dropped nearly twenty dollars in a single trading day, closing at $44.88. Plaintiffs did not receive certificates for their "owned" shares until some time in November. They received their vested shares in early December, when Nortel stock was still trading in the range of $40.

In its motion for summary judgment, Nortel presents two arguments. First, Nortel argues that the exchange of shares took place in accordance with the terms of the contract. Second, Nortel

---

[1] A small proportion of these shares vested shortly after the merger, on October 14 and October 19, 2000. The parties also owned a substantial number of "unvested" restricted shares, on which the restrictions were scheduled to lapse later. LeBlanc, Bohannon, and Jordan owned 120,000 such shares, while Tenereillo owned 80,000 such shares. Those shares are not at issue in this case.

argues that Plaintiffs have failed to present evidence of causation and damages resulting from the delayed delivery. Upon review of the arguments of counsel, the evidence in the record, and the relevant legal authorities, the Court finds that there are genuine issues of material fact with regard to both matters, and that judgment as a matter of law is precluded in this case. Accordingly, and for the reasons set forth below, the motion for summary judgment is hereby **DENIED**, as to Plaintiffs' claims for breach of contract and negligence. Summary judgment is **GRANTED**, however, as to Plaintiffs' claim for conversion.

**I.      Breach of Contract**

Plaintiffs' primary cause of action is a claim for breach of the merger agreement's provision that the exchange of shares was to take place "as promptly as practicable." Specifically, the agreement provided as follows:

> As promptly as practicable after the Effective Date, Nortel Networks shall send or cause the Exchange Agent to send or cause to be sent to each former holder of record of shares . . . of [Alteon] Common Stock immediately prior to the Effective Time transmittal materials for use in exchanging such stockholder's Old Certificates for the consideration set forth in this Article III. Nortel Networks shall cause the New Certificates representing Nortel Networks Common Shares into which shares of a stockholder's [Alteon] Common Stock are converted at the Effective Time . . . to be delivered to such stockholder upon delivery to the Exchange Agent of Old Certificates representing such shares of [Alteon] Common Stock . . . owned by such stockholder.

Agreement, § 3.05(b). The record before the Court leaves open material issues as to the timing of various phases of the exchange process that make it impossible to determine, as a matter of law, whether the exchange took place as promptly as practicable.

Initially, it is necessary to determine the legal construction of the term "as promptly as practicable." The parties agree that under the terms of the merger agreement, New York law governs the construction of contract terms. Under New York law, "[t]he construction and

interpretation of an unambiguous written contract is an issue of law within the province of the court, as is the inquiry of whether the writing is ambiguous in the first instance." Katina v. Famiglietti, 761 N.Y.S.2d 327, 329 (N.Y.A.D. , 2nd Dept., 2003). "The objective is to determine the parties' intention as derived from the language employed in the contract ." Id.

> The intent of the parties to a contract can be determined as a matter of law without a trial where that intent is discernible from the four corners of an unambiguously-worded agreement. Where, however, the language is susceptible of varying but reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of the fact.

Funding Partners, Inc. v. RIT Auto Leasing Group, Inc., 733 N.Y.S.2d 901, 902 (N.Y.A.D., 2nd Dept., 2001).

The parties have not cited, and the Court has been unable to find, any case interpreting the specific term "as promptly as practicable" under New York law. There are, however, a number of New York cases that construe the term "as soon as practicable," which occurs frequently in insurance contracts in the context of the timing of an insured's notice of claim. Nortel, in its summary judgment brief, relies on Mighty Midgets, Inc. v. Centennial Ins. Co., 389 N.E.2d 1080 (N.Y. 1979), which notes the flexibility of the term and the fact-specific inquiry that it requires:

> It is well settled that the phrase "as soon as practicable" is an elastic one, not to be defined in a vacuum. By no means does it connote an ironbound requirement that notice be "immediate" or even "prompt", relative as even those concepts often are; "soon", a term close to each of these in common parlance, **is expressly qualified in the policy here by the word "practicable."** Nor was compliance with the insurance policy's temporal requirement to be measured simply by how long it was before written notification came forth. More crucial was the reason it took the time it did. **So, the provision that notice be given "as soon as practicable" called for a determination of what was within a reasonable time in the light of the facts and circumstances of the case at hand**. Of course, there is no inflexible test of reasonableness. As with most questions whose answers are heavily dependent on the factual contexts in which they arise, rules of general application are hard to come by.

Id. at 1083-84 (emphasis added).

As the discussion in Mighty Midgets illustrates, the term "as soon as practicable" or "as promptly as practicable" is inherently ambiguous. Although the court hints that "prompt" may be a more demanding term than "soon," both terms are modified by the word "practicable," which gives a degree of flexibility and discretion to the party with the duty. Extrinsic evidence in the record may offer guidance as to the degree of flexibility that the parties intended to permit. Alteon's former director of corporate affairs, Frank Laurencio, has testified that during negotiation of the merger agreement, Alteon asked for a specific ten day limit, but Nortel rejected the term and the parties agreed on the more indefinite time period. In the proxy materials submitted to Alteon stockholders prior to the vote on the merger, stockholders were notified that

> the exchange of certificates representing your shares of Alteon common stock for certificates representing Nortel Networks common shares will not take place immediately after completion of the merger. As a consequence, you will be unable to sell or otherwise transfer these Nortel Networks common shares for a period following completion of the merger. The market value of the Nortel Networks common shares you receive in the merger may be either lower or higher at the time you receive your certificates representing Nortel Networks common shares than at the time of the merger.

Doc. 43, Defendant's Summary Judgment Brief, Ex. F. In an email to Alteon employees dated September 26, 2000, Alteon's chief financial officer, Jim Burke, warned that the physical exchange of share certificates after the merger "could take a couple of weeks or more." Id., Ex. G. As Burke further explained, "[t]he message here is that you should plan for a period which might be as long as a month or so during which you will not be able to sell stock." Id.

This case presents issues of material fact not only with regard to the construction of the contract term in question, but also with regard to the circumstances of Nortel's performance. As set forth above, consistent with the holding in Funding Partners, under New York law it is for the trier of fact to decide the degree of flexibility allowed to Nortel in making the stock exchange. It is also

for the trier of fact to decide whether Nortel acted within that degree of flexibility. The term "as promptly as practicable" is less stringent than "as promptly as possible," in that it suggests that compliance may be delayed not only by circumstances outside the party's control, but also by practical concerns. A jury will have to determine whether any delays in the exchange of stock certificates in this case were the result of such practical considerations or merely the result of neglect or incompetence.

Because of its procedural posture, <u>Mighty Midgets</u> illustrates the fact-sensitive nature of the inquiry required in this case. In <u>Mighty Midgets</u>, New York's highest court affirmed the judgment of a trial court sitting without a jury, who held that the defendant insurance company was obligated to provide liability coverage to its insured for an accident in which a child was injured. There had been a delay of seven and a half months between the occurrence of an accident and notice to the insurer. The trial court found that this notice was "as soon as practicable," in that the delay occurred as a result of the conduct and representations of the insurer and its agent and the insured's lack of sophistication. <u>Mighty Midgets</u> is not a case involving judgment as a matter of law. There were questions of fact which the trial court considered and resolved for itself in determining that the delay was not unreasonable. The Court of Appeals noted that its review was "limited to determining whether the conclusion of the fact-finding courts finds support in the evidence" and held that "there was enough evidence from which it could be found that the Midgets' failure to notify the insurer before it did was not unreasonble." <u>Id</u>. at 1084. The holding of <u>Mighty Midgets</u>, therefore, suggests that resolution of this case requires a finder of fact to determine the reasons why the exchange of stock took as long as it did, and whether it was made within a reasonable time given the facts and circumstances of the case.

In a factually similar case, a federal district court applying New York law has held that whether performance took place "as promptly as practicable" was a question of fact. Caleb & Co. v. E. I. DuPont de Nemours & Co., 599 F. Supp. 1468 (S.D. N.Y. 1984), arose out of DuPont's "hostile" attempt to take over Conoco. DuPont made a tender offer to Conoco shareholders, offering to pay cash or exchange shares of DuPont for shares of Conoco tendered by the shareholders. The tender offer provided that the exchange or payment was to take place "as promptly as practicable" after the occurrence of certain events. The plaintiff alleged that the defendants intentionally delayed the payment due to tendering shareholders. On motion to dismiss, the court held:

> Whether payment was prompt or not is an issue of fact to be determined in light of the facts and circumstance of a particular tender offer transaction and the customary practices of the financial community. [Cit.] This determination is for the jury.

Id. at 1474.

In this case, there are numerous questions of fact regarding the timing of Nortel's performance and the reasons for delays in the exchange of share certificates. The "owned shares" certificates for Jordan and LeBlanc were not issued by Montreal Trust until November 1. Bohannon's certificate was issued on November 14. There is no evidence in the record to show when those certificates were delivered or when Plaintiffs actually received their certificates. At least four to six weeks passed between the effective date of the merger and the completion of the share exchange for the owned shares. Even more time was required for the exchange of the certificates for "vested shares." The record shows that Plaintiffs received those certificates on December 4 or 5, two months after the effective date.

It is not clear from the record who or what was responsible for the delays, or whether it was practicable for Nortel to move more promptly. Nortel suggests that Plaintiffs were responsible for

the delays. The evidence supporting this claim is inconclusive and contested. Indeed, the evidence in general seems incomplete. Most of the witnesses, perhaps understandably, seem to have poor memories of the precise sequence of events five years ago. In addition, the documentary evidence, particularly concerning the dates that various events took place, is less than might be expected.

One important disputed fact concerns the date that the letters of transmittal were first mailed to Alteon stockholders. Nortel contends that the letters were mailed out on October 9, or no later than October 11. There is no evidence in the record to support the October 9 mailing date. As evidence that the letters were mailed some time before October 11, Nortel offers a pair of emails, one in which Lara Donaldson of Montreal Trust states to Anna Ventresca of Nortel that the mailing was "completed," and another in which Ventresca directs Nortel to wire Montreal Trust funds to pay for the mailing. These emails are likely to be admissible under the business records exception of Rule 803(6) of the Federal Rules of Evidence. The information in the emails may also be admitted through the testimony of Ms. Donaldson or Ms. Ventresca, and the email may be used to refresh their recollection, if necessary. Ms. Donaldson was not questioned about her email during her deposition. In addition to the Ventresca and Donaldson emails, there is evidence to indicate that a number of certificates were received by Montreal Trust as early as October 13, although it is disputed whether the certificates were accompanied by the required letters of transmittal.

Plaintiffs contest this evidence. LeBlanc, Bohannon, and Tenereillo have testified by deposition that they first received the letters of transmittal in late October and returned the completed letters with their certificates immediately afterwards. All of the Plaintiffs, along with fellow Pharsalia founder Chip Howes, have testified that they held a "signing party" on October 24, on which they all completed the letter of transmittal forms, to be delivered in a single package.

Their testimony is corroborated by emails referring to the signing party and by Nortel's admission that Montreal Trust received the letters of transmittal for Jordan and LeBlanc on October 26 and 27. A jury, finding the testimony of the Plaintiffs to be credible, could draw the inference that the letters of transmittal were sent, to Plaintiffs at least, well after October 11. Even by simple first class mail, it is unlikely that the letters would have taken nearly two weeks to reach their destination. Nortel has provided no evidence of circumstances or concerns that might have made it impracticable to send the letters earlier.

The evidence is more uncertain with regard to the reason for the much longer delay in exchanging the vested shares. Before examining the evidence pertaining to the exchange of the vested shares, it is necessary to note that the same exchange procedures applied to the "vested" shares as to the "owned" shares under the terms of the merger agreement. Plaintiffs have argued that the exchange procedures of Section 3.05(b) of the merger agreement did not apply to the vested shares. Plaintiffs rely on the terms of each Plaintiff's original stock purchase agreement with Pharsalia, which provided, at section 2.8, that the restricted shares were to be held in escrow by the company as long as the right of repurchase persisted. Upon expiration of the right of repurchase, the shares were to be released to each Plaintiff upon request. Plaintiffs contend that because of this provision, they were entitled to receive their vested shares immediately upon request, without submitting the letters of transmittal and old certificates to Nortel's exchange agent.

Plaintiffs' argument is not persuasive. Although the terms of the stock purchase agreements continued to apply after the merger and have some relevance to this case, they did not foreclose the certificate exchange procedures of the merger agreement. At the time of the merger, there were already certificates in existence for the vested shares of Alteon stock. There is nothing in the merger

agreement to indicate that these certificates were to be treated differently from any other "old certificates." Under the procedures defined in the merger agreement, Nortel could not simply throw the Alteon certificates away and issue new Nortel certificates. The certificates had to be properly transferred by the stockholder, accounted for by the exchange agent, and exchanged for new shares. Such exchange procedures were industry practice, to "ensure that there is no fraud" and to provide "some comfort and protection to the shareholder and to the company that the right person who owns those shares or the shareholder of record is legally entitled to receive the Nortel Network share certificates." McCarthy dep., p. 111.

It was Nortel's obligation to deliver the certificates for the vested Alteon shares to Plaintiffs, who were then to return the certificates to Nortel with the letters of transmittal. Nortel's apparent failure to do so may be found to account for much of the delay in the exchange of the certificates. Rather than deliver the certificates to Plaintiffs, Nortel (acting primarily through former employees of Alteon) attempted to take a short cut, maintaining possession of the certificates while the Plaintiffs submitted their partially-completed letters of transmittal.

The record is unclear as to who had physical possession of the vested share certificates. The former Alteon stock administrator, Lanson Wan, has testified that the certificates for the vested shares "ended up" on her desk shortly after the merger closed. After the signing party on October 24, Plaintiffs mailed their partially-completed letters of transmittal to Ms. Wan, who was supposed to fill in the numbers for the share certificates and forward the letters to the Canadian office. Ms. Wan has indicated, however, that she no longer had possession of the share certificates at the time. Her recollection was that she forwarded them to Anna Ventresca or Karen McCarthy at Nortel's corporate office in Canada. Testimony from Ms. Ventresca contradicts Ms. Wan's account. Ms.

11

Ventresca denies receiving the stock certificates from Ms. Wan in October. She testifies that Ms. Wan was highly protective of her role as Alteon's stock administrator and that there was also difficulty in obtaining data from Ms. Wan related to the schedule for the lapse of the right of repurchase on the restricted shares. Ms. Ventresca's recollection is supported by an email from Lanson Wan to Thomas Bohannon on November 27, 2000, in which Ms. Wan writes

> The Pharsalia stock certificates were forwarded to the transfer agent on Wednesday, 11/22/00, and the stock file pertaining to the vesting schedules and accelerated shares due to change in control for the restricted shares was emailed to Nortel for their review.

Ex. AA to Defendant's Motion for Summary Judgment. From this email it could be inferred that Ms. Wan maintained possession of the certificates until November 22. The new certificates for Plaintiffs' vested shares were finally issued on November 29, 2000, and received by Plaintiffs on December 4 or 5.

Based upon this evidence a reasonable jury could conclude that the delay of the exchange process for the vested shares was caused by some failure in communication between the former Alteon stock administrator and Nortel's main office, or by Alteon's and Nortel's failure to release the vested Alteon certificates to the Plaintiffs. There is no evidence to refute Plaintiffs' testimony that they completed the letters of transmittal and sent them to Ms. Wan on October 24. There is no evidence that Plaintiffs themselves ever possessed the actual stock certificates for these shares. There is conflict and confusion, however, as to what happened to those letters after Plaintiffs sent them and as to who did have possession of the stock certificates. Although Nortel presents evidence to suggest that Ms. Wan possessed the certificates and was responsible for the delay in sending them to Nortel, blaming her does not absolve it of responsibility for the delay. As of October 5, 2000, Lanson Wan was an employee or agent of Nortel, and Nortel is accountable for her actions.

**II.     Tort Claims**

In addition to their breach of contract claims, Plaintiffs LeBlanc, Bohannon, and Jordan have brought claims for conversion under Georgia law, and Plaintiff Tenereillo has brought a negligence claim under California law. The parties have agreed that Tenereillo's negligence claim is parallel to, and duplicative of, the breach of contract claim. California law allows third parties to a contract to pursue a claim for tort liability against a defendant "for his or her negligent failure to carry out the obligations undertaken in the contract." Adelman v. Associated Int'l Ins. Co., 108 Cal. Rptr. 2d 788, 795 (Cal. App. 2001). To the extent, therefore, that there are genuine issues of material fact as to Nortel's performance of its obligations under the contract, summary judgment is not warranted as to the negligence claim.

As to the conversion claim, Nortel has shown that it is entitled to judgment as a matter of law. Georgia law provides that "when someone comes into lawful possession of personal property, in the absence of a demand for its return and a refusal to return the personal property, there is no conversion." Taylor v. Powertel, Inc., 551 S.E.2d 765, 769 (Ga. Ct. App. 2001). Pursuant to the terms of the stock purchase agreements and the merger agreement, Nortel was in lawful possession of the old Alteon certificates and of the new Nortel certificates. There is evidence that Plaintiffs made a demand for the new Nortel certificates, but no evidence of a refusal by Nortel to deliver them. There is only evidence of a delay in the delivery. This delay may have been in breach of contractual duties to exchange the certificates "as promptly as possible," but does not constitute a conversion. Plaintiffs' conversion claim was originally premised on an allegation that Nortel delayed delivery of the certificates in an attempt to force Plaintiffs to sign Section 280G tax waivers. There is no evidence whatsoever in the record to support this allegation.

**III.     Damages**

Summary judgment is further foreclosed because there is a genuine issue of material fact as to whether Plaintiffs suffered damages as a result of the alleged delay in the exchange of certificates. In contract cases, the aim of damages is "'to put the injured party in as good a position as he would have had if performance had been rendered as promised.'" Kaufman v. Diversified Indus., Inc., 460 F.2d 1331, 1336 (2nd Cir. 1972) (quoting 5 Corbin, Contracts § 992 (1964)).  In the context of a delayed delivery of stock, a plaintiff has the burden to show that he would have sold the shares, had he received them on time. Id.  The measure of damages is the difference between the price on the date that the plaintiff would have sold his stock and the price on the date that he actually received his stock.  In this case there is evidence to support an inference that Plaintiffs originally intended to sell their stock as soon as they received it, though this evidence is vigorously contested.

The primary evidence of Plaintiffs' intent is in their affidavits, executed on August 25, 2005, and filed in connection with their response to Nortel's motion for summary judgment.  In their affidavits, the Plaintiffs each state, in identical words, that

> During the period of time beginning on October 5, 2000 and ending on October 24, 2000, it was my intention to immediately sell or monetize each share of Nortel stock to which I was entitled upon receipt of certificates representing said shares of stock. In order to monetize my unrestricted shares of Nortel stock, I could have purchased a financial vehicle that would have provided me with a guaranteed minimum dollar amount per share in exchange for releasing my right to control or possess said share certificates to a third party.   Upon receiving my unrestricted Nortel certificates, I would have sold or otherwise monetized said shares of stock that same day by choosing whichever option provided me with the most value.

Doc. 65, Plaintiffs' Response Brief, Ex. A-D, ¶ 5. The Plaintiffs then go on to explain that after the dramatic price drop that took place on October 25, they reevaluated their decisions to sell and decided to hold on to the stock.

14

As Nortel correctly points out, there are a number of factors which call the credibility of this testimony into doubt. Foremost among these factors is the fact that the testimony comes five years after the fact, in the context of litigation. It is a bit convenient that Plaintiffs now recall that they intended to sell their shares at $60 rather than at $40. Millions of investors, the Court included, look back at the bear market that began in 2000 and wonder why they held on to their shares in the midst of a long and steady slide, cherishing hopes that the bottom was near and a rally close behind. Any investor would love to invoke the rules of the playground, and call for a "do-over." Nortel also notes that Plaintiffs did not sell their stock when they did receive it, either to avoid short-term capital gains taxes or out of hope that the stock would recover. The tax consequences of selling early were substantial, given that Plaintiffs' $8.00 investment in January had grown in value to nearly ten million dollars in December, even after the twenty-point price drop in October.

Notwithstanding these concerns, Plaintiffs' affidavits have sufficient credibility to create an issue of fact and withstand summary judgment. In contrast to Scully v. US WATS, Inc., 238 F.3d 497 (3rd Cir. 2001), this case does not require the jury simply to "accept a plaintiff's after-the-fact assertion that he would have sold stock at a time that, in hindsight would have been particularly advantageous." Id. at 513. Plaintiffs do not simply pick the most advantageous date and allege that they would have sold their stock at that time; they contend instead that they intended to sell their stock as soon as they were able to. This decision is in keeping with common sense. Plaintiffs had become multi-millionaires essentially overnight. The great bulk of their assets was tied up in a single stock, which had fallen in value substantially in the previous several weeks. Plaintiffs still had a large number of restricted Nortel shares which had not vested and which they would be unable to sell for several months. It would have been sensible for Plaintiffs to liquidate the first delivery

15

of stock immediately, to diversify their investments. In addition, one Plaintiff, LeBlanc, had already entered into a contract to purchase a house for $2.75 million, to be paid in cash.

Plaintiffs' case is more comparable to two cases cited in footnote three of Scully, offered by the court as counter-examples to contrast with that plaintiff's case. The Scully court noted that in Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1243 (10th Cir. 2000), the plaintiff's testimony that he would have exercised his stock options on a certain date was confirmed by the fact that the date coincided with his planned retirement date. Similarly, the court noted that in Commonwealth Associates v. Palomar Medical Technologies, Inc., 982 F. Supp. 205 (S.D.N.Y. 1997), the plaintiff firm's assertion that it intended to sell stock on a certain date was "confirmed by the firm's demonstrable need at the time to quickly raise cash in order to satisfy two impending financial obligations." Scully, 238 F.3d at 513 n. 3. In those cases, as in this case, the date on which the sale of stock or exercise of options was allegedly intended coincided with a significant event that had nothing to do with the price of the stock. Plaintiffs' affidavit testimony about their intent to sell as soon as the exchange was completed is supported by sensible reasons for selling stock at that time.

It will be for the jury to determine whether Plaintiffs' testimony is credible or is merely self-serving hindsight. The jury will be able to consider whether the same tax concerns and hopeful outlook that convinced Plaintiffs to hold their shares in December 2000 might also have convinced them to hold their shares in October 2000. The jury will also be able to consider the demeanor and personal credibility of the Plaintiffs as witnesses on the stand. On motion for summary judgment, the affidavits are sufficient to create an issue of fact and foreclose judgment as a matter of law.

For the reasons set forth above, Defendant Nortel's motion for summary judgment (Doc. 43) is **DENIED** as to Plaintiffs' claims for breach of contract and negligence, and **GRANTED** as to Plaintiffs' claims of conversion.

SO ORDERED, this the 30th day of March, 2006.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

chw